# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| In Re:<br><br>LAURA T. REIS,<br><br>Debtor. | Bankruptcy Case<br>No. 22-00517-JMM |
|---|---|

### MEMORANDUM OF DECISION

Appearances:

    Matthew T. Christensen, JOHNSON MAY, PLLC, Boise, Idaho, Attorney for Plaintiff.

    Matthew W. Grimshaw, Boise, Idaho, subchapter V Trustee.

    Andrew S. Jorgensen, Boise, Idaho, Attorney for United States Trustee.

### *Introduction*

Debtor Dr. Laura T. Reis ("Debtor") filed a bankruptcy petition on November 22, 2022. Doc. No. 1. In doing so, she indicated her intention to file under chapter 11, subchapter V ("Sub V").[1] *Id*. Matthew W. Grimshaw was appointed as the Sub V trustee ("Sub V Trustee"). Doc. No. 14. On February 6, 2023, the United States Trustee's ("UST") office filed an objection to Debtor's eligibility to proceed under Sub V. Doc.

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM OF DECISION – 1

No. 32. A brief opposing the objection was filed, and the Court conducted an evidentiary hearing on the objection after which it took the objection under advisement. Doc. Nos. 44 & 45.

On April 13, 2023, while the issue of eligibility was under advisement, a hearing on confirmation of Debtor's proposed plan of reorganization was conducted. Doc. Nos. 37 & 60. The parties generally conceded that all impediments to confirmation, other than eligibility, had been resolved and therefore § 1129(a)(1) was at issue.[2] In the interest of economy, the Court continued the confirmation hearing until eligibility was determined.

After considering the evidence and testimony presented and the submissions and arguments of the parties, as well as the applicable law, this decision resolves the objection. Rules 7052; 9014.

## Facts

The facts of this case are largely undisputed. Prior to entering medical school, the Debtor held a master's degree in community addictions counseling and worked as a treatment coordinator for a juvenile detention facility. In that job she primarily helped juveniles and their families with the transition back into the community. Having worked in that job for numerous years, she decided that medical school would offer her the ability to care for people in a more complex manner and to provide a higher level of care, but conceded that she also believed a medical degree would increase her income. She did not

---

[2] Section 1129(a)(1) prevents a bankruptcy court from confirming a plan if it does not comply with the applicable provisions of the Code. Section 1129(a)(2) likewise prevents the Court from confirming a plan if the plan proponent is not compliant with the provisions of the Code. In other words, if the Debtor, who is the plan proponent in this case, is ineligible under Sub V, then she cannot confirm a plan under Sub V, as §§ 1129(a)(1) or (a)(2) prevents it.

MEMORANDUM OF DECISION – 2

own a business prior to entering medical school, nor did she have any existing student loan debt.

Between 2005–2009, Debtor attended medical school at the West Virginia School of Osteopathic Medicine.  Because she was unmarried and because it is difficult to work outside of medical school classes, Debtor applied for and relied on student loans for educational and living expenses during her medical school years.  In total, Debtor incurred about $320,000 in student loans.  Ex. 101.  When she took out the student loans and began her medical studies, Debtor knew she would first complete a residency upon graduating but did not know where or for whom she would be working afterward.  She received a degree and a medical license, and immediately thereafter she completed a three-year residency in Florida.  Following completion of her residency, Debtor did not return to the employment she had before entering medical school.  Instead, she moved to Connecticut and worked for a hospital for a year.  She contracted meningitis and spent time as a patient at Johns Hopkins due to that illness.  Thereafter, Debtor took a job in Iowa, again working for a hospital, and after practicing there for a year, she was asked to sign a new contact which she refused to sign, and her employment was terminated.

In 2015, Debtor moved to Boise and worked for Saltzer Health in Nampa, and later worked for Primary Health Medical Group.  From 2012 to 2022, she was unable to work from time to time due to health issues, including auto-immune issues and complications from having Covid-19 three separate times.  She underwent eight hospitalizations during that time and has had to stop working for a month or two on several occasions.  Despite her own health concerns, in August 2021, Debtor opened her

MEMORANDUM OF DECISION – 3

own practice. The practice closed on October 15, 2022, due in part to unfortunate timing, as the launch of her practice occurred during the Covid-19 outbreak in the United States and Idaho. In addition, since 2021, Debtor has been providing medical services via a virtual practice called Home Health which offers men's health advice unrelated to her brick-and-mortar operation. Near the time her business closed, Debtor also began employment with the Idaho College of Osteopathic Medicine as an adjunct professor, which employment is ongoing. Ex. 203, p. 35. Debtor testified that the illness she has suffered, and continues to struggle with, along with the Covid-19 outbreak that damaged her practice, are what has hampered her ability to make a better living as a physician.

Debtor has used her medical school training since graduating and has worked continuously as a doctor except when she physically or medically could not. Until 2020, when her first LLC[3] was established and her practice opened, all of her employment, including before she went to medical school, was as an employee for companies not operated by the Debtor, including her work as an adjunct professor.

On October 17, 2018, Debtor filed a chapter 7 bankruptcy petition. Ex. 203. Notably, on Part 16 of the petition, Debtor indicated that her debts, including student loan debt in the amount of $632,723, were primarily consumer debts, although Debtor testified

---

[3] The record is sparce on this issue. Debtor testified that she formed an LLC in 2020 but in 2022, after she closed the brick-and-mortar business, a second LLC was formed by the Debtor through which she offers men's health services. The Court's presumption is also based on undisputed discussions at the status hearing conducted by the Court when the Debtor, the UST, and the Sub V Trustee, discussed the two LLCs. While the record is not clear, no party has attempted to distinguish the two LLCs or what debts disclosed by Debtor in Exhibit 201 arose under each. Rather they have, for the purpose of this hearing, focused on the student loan debts and argued their positions based upon a presumption that the remaining debts, other than the debt secured by the Debtor's automobile, arise out of a business or commercial activity of the Debtor.

MEMORANDUM OF DECISION – 4

that she had no discussions with her then-bankruptcy counsel about that classification. Id. at pp. 6, 8, 25–27 & 32.

On November 22, 2022, Debtor filed a bankruptcy petition under Sub V. Ex. 201. In this bankruptcy case, Debtor indicated her debts were not primarily consumer debts, and she listed $645,869,89 in student loan debt. Id. at pp. 28 & 30–31. On February 6, 2023, the UST timely filed the instant objection to Debtor's election to proceed under Sub V. Doc. No. 32; Rule 1020(b).

## *Analysis*

A.  Factual issues regarding three of Debtor's debts

There are some factual issues arising out of Debtor's summary of certain debts in her schedules that affect her eligibility for Sub V: the debt connected to the home where the Debtor resides,[4] the student loan debts, and her vehicle debt. The Court will address each.

*1. The House Debt*

In the summary of schedules filed as part of Debtor's Sub V petition, she listed her total liabilities at $1,754,787.73. Ex. No. 201, p. 8. Debtor testified she is not personally obligated on the $673,776 mortgage debt held by Shellpoint Mortgage disclosed in schedule D and included in that summary. She testified that is a separate debt incurred by her husband. On schedule D, the Debtor stated the following: "Debtor is not listed on

---

[4] While the parties, for the purpose of the hearing, have agreed that the debt encumbering the house should not be considered, the fact that the Debtor scheduled the house debt must be clarified before addressing the student loans.

MEMORANDUM OF DECISION – 5

the mortgage. Mortgage is in Spouse's name only. The house is subject to a Post Marital Agreement." Ex. No. 201, p. 23. This debt encumbers the home in which Debtor resides with her non-filing husband. Debtor does not claim any interest in the home but testified that, for reasons she did not understand, the title company handling the loan closing when the Shellpoint Mortgage debt was incurred prepared a quitclaim deed which listed her as a fee owner with her husband on the home. On this point, Debtor testified when her husband refinanced the loan last summer, that "I somehow ended up on the title." She testified her inclusion as an owner of the home is a mistake and the home, encumbered by the lien, is listed as her husband's sole asset under an executed postnuptial agreement after their marriage.[5] Neither the UST nor the Sub V Trustee object to this characterization for the purposes of this hearing.[6] Therefore, excluding the Shellpoint debt, the Debtor's total scheduled debts are $1,081,011.73.[7]

    2. *Student Loan Debt*

The Debtor also scheduled student loans and testified that they have a collective unpaid balance of $645,869,89. Ex. No. 201, p. 32 at Part 4. Exhibit 101, a report from the West Virginia School of Osteopathic Medicine, itemizes Debtor's student loans

---

[5] The postnuptial agreement was not offered as an exhibit at the hearing.

[6] This concession is important because if the Shellpoint debt is included then the total debts would be $1,754,787.73 and the Debtor would be required to show that $877,393.87 arose out of commercial or business activities. Arguably, the Shellpoint debt of $673,776 was incurred primarily for a "personal, family or household purpose" and would therefore be consumer debt under § 101(8) and, depending on the balance of the student loans, may not put the Debtor's obligations over the 50% commercial or business debt threshold.

[7] $1,754,787.73 - $673,776 = $1,081,011.73.

MEMORANDUM OF DECISION – 6

incurred in 2005, 2006, 2007, 2008 and 2009[8] under Perkins, Stafford, Unsubsidized Stafford, Grad Plus and Other. The collective principal amount disclosed on this exhibit is $319,028.34. Ex. 101, p. 5.[9] The Debtor testified the balance of $645,869.89[10] represents the principal plus accrued interest, along with other costs under the loans.

### 3. Automobile Debt

Debtor testified she has a debt which is secured by her automobile. While she did not identify whether she thought this was a business or a consumer debt, her counsel conceded during oral argument that the automobile debt is a consumer debt. This debt is described in schedule D as $29,066.53. Ex. No. 201, p. 23.

### B. Analysis of Debtor's Eligibility under Sub V

Pursuant to § 1182(1)(A), a debtor seeking to proceed under Sub V in 2022[11] must qualify as a "Debtor," which under Sub V:

> means a person engaged in commercial or business activities . . . that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount of not more than $7,500,000 (excluding debts owed to 1 or more

---

[8] The school years are identified as 2005-06, 2006-07, 2007-08 and 2008-09 in that exhibit.

[9] There is an unexplained difference between the balance contained on page 5 of the summary and the total of all loans disclosed on page 1 of Ex. No. 101. The principal balance of all the loans on page 1 is $320,196 whereas the calculation on page 5 is $319,028.34. Since the difference is minor and the calculation on page 5 appears to be an updated summary, the Court concludes the principal balance is the amount reflected on page 5.

[10] Schedule E/F, introduced as part of Ex. 201, contains a description of the student loan debt, designated as "Nelnet" debt, shown on paragraphs 4.13, 4.14, 4.15, 4.16 and 4.17 of schedule F, Ex. 201, pgs. 30 & 31, and 4.9 for Firstmark Services scheduled as $31,523.73, *Id.* at p. 28. These figures support total student loan debt of $645,869.89 as reflected on the summary. *Id.* at p. 32.

[11] Because Debtor filed her petition in 2022, the eligibility requirements in place at that time are applicable in this case.

MEMORANDUM OF DECISION – 7

affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor.

The Debtor has the burden of establishing Sub V eligibility. *NetJets Aviation, Inc. v. RS Air, LLC (In re RS Air, LLC)*, 638 B.R. 403, 414 (9th Cir. BAP 2022) ("We agree with the majority[12] view and hold that the burden to prove eligibility for subchapter V should be placed on the debtor, especially considering the many advantages subchapter V offers debtors over a 'traditional' chapter 11…. It also makes sense to place the burden on the debtor because debtors are in the best position to prove that they are qualified to be in subchapter V.")

For purposes of the objection at issue, the UST does not dispute that Debtor was engaged in commercial or business activities on the petition date or that her debts fall below the ceiling established in § 1182(1)(A). Doc. No. 32 at p. 4. Rather, the issue before the Court is whether less than 50 percent of Debtor's debts arose from commercial or business activities. *Id*. This determination turns on the characterization of Debtor's student loan debt, because, as described above, more than half of her debt is derived from student loans. The UST advances two arguments in his objection: first, the plain meaning

---

[12] Courts are split on whether the moving party or the debtor bears the burden of proving Sub V eligibility, but the vast majority hold that the debtor bears the burden of demonstrating eligibility to proceed under Sub V. *See In re Rickerson,* 636 B.R. 416, 422 (Bankr. W.D. Pa 2021); *In re Family Friendly Contracting LLC*, 2021 WL 5540887, *2 (Bankr. D. Md Oct. 26, 2021); *In re Vertical Mac Constr.*, 2021 WL 3668037, *2 (M.D. Fla. July 23, 2021); *In re Port Arthur Steam Energy, L.P.*, 629 B.R. 233, 235 (Bankr. S.D. Tx 2021); *In re Blue*, 630 B.R. 179, 187; *In re Offer Space, LLC*, 629 B.R. 299, 304 (Bankr. D. Utah 2021); *In re Ikalowych*, 629 B.R. 261, 275; *In re Sullivan*, 626 B.R. 326, 330 (Bankr. D. Colo. 2021); *In re Johnson*, 2021 WL 825156, *4 (Bankr. N.D. Tex. March 1, 2021); *In re Thurmon*, 625 B.R. 417, 419 n.4 (Bankr. W.D. MS Dec. 8, 2020); *In re Blanchard*, 2020 WL 4032411, *2 (Bankr. E.D. La. July 16, 2020); *In re Wright*, 2020 WL 2193240, *2 (Bankr. D. SC April 27, 2020); *but see In re Body Transit, Inc.*, 613 B.R. 400, 409 n.15 (Bankr. E.D. Pa. 2020) (objecting party is the de facto moving party bearing the burden to prove the debtor is not entitled to subchapter V relief); *Hall L.A. WTS, LLC v. Serendipity Labs, Inc. (In re Serendipity Labs, Inc.)*, 620 B.R. 679, 680 n.3 (Bankr. N.D. Ga. 2020).

MEMORANDUM OF DECISION – 8

of the statute does not permit these student loans to be characterized as arising from commercial or business activities; and second, Debtor's student loans are "consumer debt" under the definition provided by § 101(8). Debtor disagrees, arguing that § 1182(1)(A) requires the term "commercial or business activities" to be evaluated in two separate and independent inquiries. First, the term must be analyzed to determine whether the Debtor engaged in those activities on the petition date, and second, whether the purpose for which the debt was incurred arose from a commercial or business activity.

  1. *Structural analysis of § 1182(1)(A)*

As noted above, pursuant to § 1182(1)(A), to qualify as a debtor under Sub V, 1) a person, 2) must be engaged in commercial or business activities, 3) that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount of not more than $7,500,000, and 4) not less than 50 percent of which arose from the commercial or business activities of the debtor. § 1182(1)(A); *RS Air*, 638 B.R. at 409. As noted above, only the fourth element is at issue, which focuses the Court's analysis on whether 50 percent of Debtor's aggregate debts arose from commercial or business activities.

The UST contends the Court must interpret the statute in its entirety, and as such, the two requirements containing the phrase "commercial or business activities" must be read in tandem. Put another way, the UST reads the statute to require a nexus or contemporaneousness between Debtor's engagement in commercial activity and the debts that "arose from" commercial activity. *See In re Ikalowych*, 629 B.R. 261, 275–76

MEMORANDUM OF DECISION – 9

(Bankr. D. Colo. 2021) ("Since these two discrete elements contain a common phrase, the Court has grouped the requirements together for legal scrutiny.  And, besides, both mandates are very closely linked in how they operate.  The first element establishes a general requirement: the Debtor be 'engaged in commercial or business activities.'  The second reins in the general requirement quite substantially: half or more of the Debtor's aggregate debt must have arisen from those same 'commercial or business activities.'  The requirements must be read in tandem.").

Debtor disagrees, arguing the UST's interpretation differs from the verbiage of the statute.  Instead, the statute requires two separate analyses: 1) what is the debtor's current activity on the petition date, and 2) what was the debt incurred for?  As such, to qualify for Sub V, Debtor argues, a debtor had to have business activities on the petition date, and also had to have at least 50 percent of the debt arise from commercial or business activities, but no nexus between the two is required.  *In re Blue*, 630 B.R. 179, 191 (Bankr. M.D.N.C. 2021) ("[T]he more straightforward interpretation of § 1182(1)(A) does not require a connection of debts to current business activities.  Nothing in the statute requires that there be a nexus between the qualifying debts and the Debtor's current business or commercial activities.").

The Court agrees with Debtor's analytical framework.  Section 1182(1)(A) requires the Court to determine whether Debtor was engaged in a commercial or business activity on the petition date, and separately, whether the debts arose from the Debtor's commercial or business activities.  The former question looks at the present—the petition date. *RS Air*, 638 B.R. at 410 ("We agree with the majority, that the term 'engaged in' is

MEMORANDUM OF DECISION – 10

inherently contemporary in focus and not retrospective. Thus, a debtor need not be maintaining its core or historical operations on the petition date, but it must be 'presently' engaged in some type of commercial or business activities to satisfy § 1182(1)(A)."). The latter determination is necessarily backward looking, as it would be rare for all of a debtor's commercial or business debts to have been incurred on or around the petition date.

Here, the UST has conceded that Debtor was engaged in commercial or business activity on the petition date—she had opened her own medical practice to treat patients. Thus, this Court's focus is on the nexus required, if any, between Debtor's medical school student loan debt and the commercial or business activity she engaged in while she operated her own practice. As noted above, the caselaw goes both ways. In *In re Ikalowych*, the bankruptcy court held the debt must be "directly and substantially connected" to the commercial or business activities engaged in by the debtor. 629 B.R. at 288. In contrast, in *In re Blue*, the court required no such connection. 630 B.R. at 191.

Congress employed the phrase "not less than 50 percent of [the debt] [] arose from the commercial or business activities of the debtor." § 1182(1)(A). The statutory language contains nothing that requires a direct linkage of the commercial or business activities on the petition date and the commercial or business activities from which the debt arose. Had Congress intended to require an absolute nexus, it could have used the phrase "not less than 50 percent of [the debt] [] arose from *those* commercial or business activities of the debtor." This would have made it clear. Absent such clarity, the Court will not read this requirement into the statute.

MEMORANDUM OF DECISION – 11

By employing the verbiage it did, Congress left open the possibility that the commercial or business activities which gave rise to the debt might be different from the commercial or business activities the debtor was engaged in on the day the petition was filed. As such, the next step of the analysis is whether the student loan debt "arose from" Debtor's commercial or business activities.

*2. Did Debtor's debts arise from "commercial or business activities"?*

The Court will first examine what constitutes commercial or business activities and then analyze the facts presented here.

### a.  What constitutes "commercial or business activities"?

The Court begins by noting that the provisions of Sub V is not the first time Congress has elected to forego defining terms related to commercial or business indebtedness. Section 101(51D), which defines a "small business debtor," provides in pertinent part that this debtor "…means a person engaged in commercial or business activities … that has aggregate, noncontingent, liquidated, secured and unsecured debts as of the date of the filing of the petition… not less than 50 percent of which arose from the commercial or business activities of the debtor."  § 101(51D)(A). Moreover, the term "business debt" is used on Official Form 101 but is not defined anywhere on the form or in the Code.

Because the term "commercial or business activities" is used twice in the statute, the Court employs the same definition in each instance, though the focus of each usage is different. *Jones v. United States*, 36 F.4th 974, 983 (9th Cir. 2022) (A natural presumption and rule of statutory construction applicable here is that "identical words

MEMORANDUM OF DECISION – 12

used in different parts of the same act are intended to have the same meaning.") (quoting *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860, (1986)); *In re Parkinson Seed Farm, Inc.*, 640 B.R. 218, 248 (Bankr. D. Idaho 2022). Many courts have attempted to provide judicial gloss on the term "business and commercial activities." For example, the Ninth Circuit Bankruptcy Appellate Panel found that courts have generally held that the scope of commercial or business activities is very broad and apply a "totality of circumstances" test. *RS Air*, 638 B.R. at 410; *In re Bennion*, 2022 WL 3021675 at *2 (Bankr. D. Idaho July 29, 2022). A Colorado bankruptcy court analyzing these terms stated that the definition should be "any private sector actions related to buying, selling, financing, or using goods, property, or services, undertaken for the purpose of earning income." *In re Ikalowych*, 629 B.R. at 276. A North Carolina bankruptcy court determined that a person is engaged in business and commercial activity when the debtor is participating in purchasing or selling of goods or services for a profit. *In re Blue*, 630 B.R. at 189.

      b. <u>Application of law to the facts</u>

Turning to the facts presented here, certainly, when Debtor incurred the debt to attend medical school, she intended to practice medicine. She required a license to do so which could only be obtained after completing medical school. She testified that she hoped to open her own practice at some point, but pointed out that a residency is required first, and even after her residency, she did not feel yet qualified to open her own practice. She explained that working with other doctors for an employer for a time would help her to learn more and refine her skills and knowledge. As such, opening a practice directly out of medical school was not realistic for her. As observed by the BAP in *RS Air*, the

MEMORANDUM OF DECISION – 13

Court looks at the totality of the circumstances. It is hard to conceive, however, that the debt incurred to attend medical school fully ten years before opening a business can be construed as "purchasing or selling of goods or services for a profit."

While the very broad definition employed in *Ikalowych* presents a closer case, as Debtor's medical school debt could possibly viewed as a "private sector action[] related to … financing..., undertaken for the purpose of earning income," that court also significantly reined that definition in by requiring the business activity from which the debt arose to be the same commercial or business activity the debtor was engaged in on the date the petition was filed. In other words, Debtor would not qualify as a Sub V debtor under the *Ikalowych* analysis.

The bankruptcy court in *In re Blue* queried whether the debtor was "purchasing or selling [] goods or services for a profit." *See also In re Johnson*, 2021 WL 825156 at *7–8 (Bankr. N.D. Tex. March 1, 2021) ("applying the ordinary meaning of 'commercial or business activities' to the language of § 101(51D) [defining a 'small business debtor'], a person engaged in 'commercial or business activities' is a person engaged in the exchange or buying and selling of economic goods or services for profit.").[13] While it

---

[13] The *Ikalowych*, *Johnson*, and *Blue* definitions of commercial or business activities require a showing that the Debtor intended to make a profit. The Court acknowledges the holding of *RS Air*, which rejected a "pursuit of profit" requirement. 638 B.R. at 413 ("we conclude that no profit motive is required for a debtor to qualify for subchapter V relief. To hold otherwise would wrongfully exclude nonprofits and other persons that lack such a motive."). The *RS Air* decision was focused exclusively on whether the debtor was engaged in commercial or business activities on the petition date rather than on whether the debt arose from commercial or business activities. This is an important distinction. A debtor may certainly be engaged in commercial or business activities of a nonprofit nature, and as such, the profit motive is not required. The same analysis may not apply when it comes to the debt itself, as some motive or plan to pay off the debt incurred must surely factor in. Under the unique circumstances presented here, however, the presence or absence of a profit motive for Debtor is not determinative.

MEMORANDUM OF DECISION – 14

could potentially be construed that Debtor purchased goods or services, i.e., medical knowledge, such an interpretation is a stretch. The Debtor's education had nothing to do with buying, selling, financing, or using goods, rather it gave Debtor the opportunity, as a person, to practice a profession. *In re Bennion*, 2022 WL 3021675 at *2–3 (the transaction from which the debt resulted was not performed in the debtor's business capacity, but rather for a personal or family purpose, and therefore the debt did not arise from a commercial or business activity.).

The Court finds it germane that Debtor did not operate a private business before going to medical school and did not operate a business after obtaining her medical degree until more than a decade had passed. Rather, she was a student who hoped to gain employment following the conclusion of her studies and had aspirations of opening her own practice at some future time. When she began borrowing, Debtor did not have any specific opportunity in mind, nor did she have any employment lined up. After graduating in 2009 and completing her residency in 2012, she worked for four employers in three states before creating an LLC in 2020 and opening her practice in 2021. The majority of courts have rejected the argument that working as an employee would constitute "commercial or business activities" for purposes of eligibility under Sub V. *See In re Rickerson*, 639 B.R. 416, 426 (Bankr. W.D. Pa. 2021) (the court "does not believe that the ordinary meaning of the phrase 'commercial or business activities' encompasses an employee who is in an employment relationship with an employer—at least where the employee has no ownership or other special interest with the employer. That is to say, the Court does not believe that in common language an individual who has

MEMORANDUM OF DECISION – 15

a job as an employee for someone else would be understood as thereby engaging in a commercial or business activity."); *In re Johnson*, 2021 WL 825156 at *7–8 (debtor "is nothing more than an employee of El Reno with heightened obligations to the company on account of his role as an officer. As such, Cord does not qualify as a small business debtor under § 101(51D)." Here, the gap between incurring the debt and actually engaging in any sort of commercial or business activity as an owner is simply too great to find that the student loans at issue arose from Debtor's commercial or business activities. While it is clear that Debtor hoped to earn income from the use of her medical degree, it was entirely unclear for a decade whether she had borrowed to follow a career path as an employee working for a hospital, as a business owner, or even in public service. Accordingly, Debtor's student loans do not qualify as business debts, rendering her ineligible to proceed as a Sub V debtor.

     In so holding, the Court does not foreclose all debt which arises prior to a business opening, as supplies, product, and a space for the business often must be acquired prior to the actual opening, and there is the possibility that a debtor may open more than one business during his or her lifetime and incur debt in doing so. Nor does the Court announce any sort of *per se* rule that student loan debt can never qualify as debt arising from commercial or business activities to satisfy Sub V eligibility. Simply put, the

MEMORANDUM OF DECISION – 16

student loan debt at issue here, incurred over ten years prior to opening the medical practice, is simply too far removed for Debtor to qualify for Sub V relief.[14]

### *Conclusion*

While Debtor was engaged in a commercial or business activity on the date of the filing of the bankruptcy petition, the student loan debt she incurred did not arise from commercial or business activities. Accordingly, Debtor is not an eligible debtor under Sub V, and the UST's objection to Debtor's election will be sustained.

Because the Debtor is not eligible for relief under Sub V, the Court finds that Debtor's proposed plan may not be confirmed as it does not satisfy §§ 1129(a)(1) and (2). Therefore, confirmation of Debtor's plan is denied.

A separate order will be entered.

DATED: May 2, 2023

_____
JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

---

[14] Because the Court finds the debts did not arise from Debtor's commercial or business activities, there is no need to consider whether the student loan debt was "consumer debt," and the Court will forego that analysis.

MEMORANDUM OF DECISION – 17